**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOSHUA   J.   CRAVEN   and   CRG
PROPERTIES, INC.,

      Plaintiffs,

v.                                                                            Case No.:

CALEB   J.   WALSH   and   PARKS
MANAGEMENT LLC,

      Defendants.

_____/

## COMPLAINT

Plaintiffs, Joshua J. Craven ("Craven") and CRG Properties, Inc. ("CRG," with Craven, "Plaintiffs"), sue Defendants, Caleb J. Walsh ("Walsh") and Parks Management LLC ("Parks Management," with Walsh, "Defendants"), and allege:

## JURISDICTION AND VENUE

1.      This action involves, among other things, fraud, breach of fiduciary duty, theft, conversion, unjust enrichment, and securities violations that Defendants perpetrated on Plaintiffs to obtain Plaintiffs' investments in excess of $565,000.00.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) based on diversity of citizenship.

3.      This is an action for money damages in excess of seventy five thousand dollars ($75,000.00), exclusive of costs, interest, and attorneys' fees.

4.      Venue lies in the Middle District of Florida pursuant to 28 U.S.C. §1391(b).

## THE PARTIES

5.      Plaintiff Craven is an individual with his primary place of residence in California, and is otherwise *sui juris*. Craven is a citizen of California for purposes of §1332(c).

6.      Plaintiff CRG is a California corporation with its principal place of business located at 5256 South Mission Road # 1006, Bonsall, California 92003. CRG is deemed a citizen of California for purposes of §1332(c).

7.      Defendant Walsh is an individual with his primary place of residence in Hillsborough County, Florida, and is otherwise *sui juris*. Walsh is a citizen of Florida for purposes of §1332(c).

8.      Walsh holds himself out to the public as a leading authority on affordable housing, property management, real estate investment and foreclosures:

> Acclaimed as a leading authority on affordable housing, property management, real estate investment and foreclosures, Caleb Walsh has built up and controls a 10 state real estate portfolio from his home in Tampa, Florida. For the past 10 years he developed one of the most sought after property management formulas in the nation which he used to train a team that manages his assets so he can focus on acquiring multiple properties per month.

*see* https://www.calebwalsh.org/ (last accessed on December 22, 2020).

9.      Walsh has a history of mismanaging investment properties either intentionally or recklessly. Indeed, he has filed numerous bankruptcy cases relating to properties of which he was either the manager or trustee. Most recently, Walsh filed bankruptcy cases in the United States Bankruptcy Court for the Middle District of Florida for Gainesville Road Community Trust (Case No. 8:20-bk-03888-CPM) and Plum Circle Community Trust (Case No. 8:20-bk-04249-CPM). In each case, the Bankruptcy Court found that Walsh was "incompetent" and committed acts of "fraud" and "dishonesty." In the Plum Circle Community Trust case and the Gainesville Road

Community Trust case, the Bankruptcy Court ultimately removed Walsh as the manager/trustee of each entity and replaced him with a Chapter 11 trustee.

10.    Defendant Parks Management is a Florida limited liability company with its principal place of business located in Hillsborough County, Florida at 13194 US HWY 301 S #374, Riverview, Florida 33578. Walsh utilized Parks Management to perpetrate his scheme and improperly obtain Plaintiffs' funds. The LLC members of Parks Management are not citizens of California.

## GENERAL ALLEGATIONS

### The Gainesville Road Investment

11.    In December, 2017, Craven received an email from Walsh (the "December 2017 Email") about an opportunity to invest in two mobile home parks (the "Gainesville Road Investment"). The December 2017 Email was a solicitation for an investment.

12.    With the goal of extracting investment money from Plaintiffs, Walsh assured Plaintiffs that he *knew* the "two mobile home parks…inside and out (as I was hired to advise on it 6 months ago) and ha[d] vetted the numbers 9 ways to Sunday."

13.    Walsh described the two mobile home parks as follows:

   a.   Our Lucaya (Sunny Oaks) Mobile Home Park, Real Property Tax ID No: 13206-002-00. 55 Spaces on 7.72 acres, 49 parked owned homes, 1 office/laundry, 3 storage mobile homes ("Sunny Oaks"); and

   b.   Edgewood Mobil Home Park, Real Property Tax ID No: 13923-000-00. 24 spaces on 2.64 acres, 22 parked owned homes, 2 single family houses ("Edgewood," with Sunny Oaks, the "Gainesville Road Properties").

14.    In connection with inducing Plaintiffs to invest, Walsh represented to Craven that the Gainesville Road Investment included the purchase of the Gainesville Road Properties. According to Walsh's representations to Craven, the Gainesville Road Properties were to be

purchased for a price of two million dollars ($2,000,000.00) with a $300,000.00 down payment and the remainder to be financed.

15.     In regards to the Gainesville Road Investment, Walsh promised Craven:

 a. To have financing in place;

 b. The equity in the Gainesville Road Properties was $3,120,000.00;

 c. The Gainesville Road Investment would "more than double the existing 33k/month income by doing the renovations and rent the empty units/empty sites;"

 d. Refinancing would happen within 6-10 months of purchase;

 e. Walsh would use one of his "private lenders to do a cash out refinance;" and

 f. Craven would "get paid back at cashout [*sic*] of the property."

16.     In short, Walsh promised Craven that he would use the investment funds that he sought from Plaintiffs for the down payment and necessary renovations to the Gainesville Road Properties.

17.     Walsh promised Craven that with said renovations the value of the Gainesville Road Properties would quickly increase the value.

18.     Specifically, Walsh assured Craven that, within a few months, he would refinance the Gainesville Road Properties, cash-in on the equity, and repay Plaintiffs their down payment plus profit.  In the December 2017 Email sent to Craven, Walsh wrote:

> If we are able to use you for the down payment for short term financing and our capital to get the park at a point of refinance with my private lenders than we can speed up the time line to a short 4-6 months easily based on the fact that we wouldn't be dependent on funds from the park itself.

19.     In reliance on Walsh's representations, on or about December 28, 2017, Craven entered into The Land Trust Agreement for the Gainesville Road Community Trust (the "GRC Trust") (attached hereto as **Exhibit A**) for the purposes of acquiring and investing in the

Gainesville Road Properties and thereafter, on or about December 28, 2017, invested $50,000.00 to be used as a down payment to acquire the Gainesville Road Properties.

20.     Pursuant to the GRC Trust, Walsh appointed himself trustee, thereby creating a fiduciary relationship between Walsh and the beneficiaries of the GRC Trust, including Craven.

21.     Among other responsibilities, Walsh was entrusted with acquiring, renovating, and capitalizing the Gainesville Road Properties to the point of refinance, cash out, and payback of the initial investment.

22.     As Trustee, Walsh was also required "to keep [] careful books showing the receipts and disbursements he[] has made on behalf of the Trust and also of the Trust Property and to keep books of the Trust open to the inspection of the beneficiaries." Walsh grossly disregarded this duty, as the record keeping was in disarray and Walsh was unable to accurately account to Plaintiffs for the receipts and disbursements of the GRC Trust.

23.     In addition to Plaintiffs' initial $50,000.00 investment in the GRC Trust, on or about January 18, 2018, Plaintiffs invested an additional $250,000.00 for a total of $300,000.00 (collectively, the "Gainesville Road Investment Funds"). Again, this investment was to be for the down payment and rehabilitation of the Gainesville Road Properties. Plaintiffs were to be passive investors and acquire a 8.3% beneficial interest in the Gainesville Road Properties through the GRC Trust.[1]

24.     Contrary to Walsh's representations, upon information and belief, neither Walsh nor any of his affiliated entities invested any capital into the GRC Trust with respect to the Gainesville Road Properties.

---

[1] Plaintiffs subsequently acquired the 16.6% interest of Kyle Ballif and 8.3% interest of Jason Boley.

25.     Plaintiffs invested in the GRC Trust based on Walsh's promises, representations, purported experience, and expertise in buying and rehabilitating mobile home parks for investment and profit, and Walsh's alleged vetting of the Gainesville Road Properties.

26.     Walsh made these representations to Plaintiffs although he knew they were false. For example:

a.  Walsh did not invest all of the money into the down payments for the Gainesville Road Properties, instead Walsh kept some or all of the invested funds for himself or affiliate entities.

b.  Walsh knowingly overstated the value of the Gainesville Road Properties.

c.  Walsh inflated the purchase prices of the Gainesville Road Properties.

d.  Walsh did not invest his own funds to improve the Gainesville Road Properties as promised.

e.  Walsh misappropriated rents from the Gainesville Road Properties.

f.  Walsh commingled monies from the Gainesville Road Properties with other properties managed by Walsh.

g.  Walsh did not bring the property to "maximum capacity" instead selling, without requisite authority, assets of the GRC Trust, including the mobile homes.

h.  Walsh took a 10% management fee from the income while claiming that the Gainesville Road Properties were otherwise operating at a loss.

i.  Walsh intentionally allowed the Gainesville Road Properties to fall into disrepair.

j.  Walsh failed to execute his duties as trustee of the GRC Trust.

k.  Walsh intentionally forced the properties into foreclosure and the GRC Trust into bankruptcy.

l.  Walsh entered into contracts for deed for the Gainesville Road Properties without properly acquiring title by deed with a title policy.

27.     Walsh knowingly and intentionally misrepresented the value of the Gainesville Road Properties to induce Plaintiffs to make an investment of $300,000.00.

28.     Upon information and belief, Walsh misappropriated the Gainesville Road Investment Funds for personal use, to pay off debts unrelated to the Gainesville Road Properties, and intentionally did not rehabilitate (or at a minimum maintain) or manage the Gainesville Road Properties. As a result, Plaintiffs have likely lost their entire $300,000.00 investment.

29.     On May 19, 2020, Walsh caused the GRC Trust to file a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Middle District of Florida (Tampa Division).

30.     While Walsh signed the bankruptcy petition on behalf of the GRC Trust, Walsh did not have the requisite authority to commence the bankruptcy filing.

31.     After a three-day trial, on August 12, 2020, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee in the GRC Trust bankruptcy case, thereby removing Walsh as the manager/trustee of the GRC Trust. In coming to that decision, based on the evidence presented at the trial, the Bankruptcy Court found "that there are some disturbing transactions, compelling to me, that lead to my finding that Mr. Walsh has been – you can call it 'incompetent,' you can call it 'fraud,' you can call it 'dishonesty.'"

32.     The Bankruptcy Court also expressed grave concern over Walsh's actions as manager because of his cross-collateralization of properties and the fact that Walsh created fraudulent transfers between the GRC Trust and the PCC Trust (defined below). The Bankruptcy Court found numerous other bad acts and mismanagement committed by Walsh, including that Walsh was "dealing out of trust," Walsh had a board and failed to conduct board meetings, Walsh failed to adhere to contractual requirements of the GRC Trust, Walsh failed to properly account for funds received by the GRC Trust, and Walsh failed to adequately maintain books and records.

Overall, the Bankruptcy Court found Walsh's testimony regarding his management of the Gainesville Road Properties to be not credible, evasive, non-responsive, and meandering.

33.     The GRC Trust bankruptcy case brought to light Walsh's mismanagement of the Gainesville Road Properties and uncovered the fraudulent scheme that Walsh utilized to obtain the Gainesville Road Investment funds from Plaintiffs.

<strong>The Plum Circle Investment</strong>

34.     On February 14, 2018, Walsh sent Craven another email (the "February 14 Email") about an opportunity to invest in another mobile home park located in Chipley, Florida (the "Chipley Property"). A true and correct copy of the February 14 Email is attached hereto as **Exhibit B**.  The February 14 Email was a solicitation for an investment.

35.     In the February 14 Email, Walsh wrote:

> Hi Josh,
>
> The more I dug into numbers on South Dakota the more i (*sic*) am convinced it is too tight and want to hold off until further investigation.
>
> That being said, the same seller who sold us Ocala property is offering a steal on the following park in Chipley, Florida since he had such a good experience with the last closing.  I advised on contract on this property since it was empty within the past six months and due to my advising they filled it to 11 tenants so far….This is under contract and closing Feb 28th and we would need to fund (open escrow) this Friday Feb 16th 2018.
>
> Interested?  I can have this doing $18,500 in 45-60 days at tops.  The rents are so far below market value and I know for a fact the demand is tremendous in this area.  I will be closing either way if you pass on this one but I thought this would be a great one to pivot since the South Dakota still needs more investigation for that high of a purchase price and down payment.
>
> Bottom line, I'll do 50/59 (*sic*) after my management entity gets 10% if you put up the $265k downpay (*sic*) needed.  I'll put up all

renovation money + cost of new homes.  Thoughts? See details below …this one will have a BIG payday in 11 months.

**Park Specifics:**

30 SPACES (ALL SEPARATELY METERED FOR COUNTY WATER, SEWER, GARBAGE, AND ELECTRIC). 26 HOMES IN THE PARK NOW (ALL PARK OWNED) HOMES ARE MOSTLY 3 BED/ 2 BATH WITH A FEW  2 BED/1 BATH AND SOME 4 BED/2 BATH.  HOMES ARE 1978 THROUGH 1993.

**Deal Terms:**

1)  Downpayment (*sic*): $265,000

2)  Purchase Price: $805,000

3)  Value: $1,200,000 ($395,000 Equity Day 1)

**Mortgage Specifics:**

PURCHASE MONEY NOTE (1st Mortgage) : Seller agrees to take back a Purchase Money Note for the amount of $540,000.000 at an interest rate of 7.5% per annum amortized over 25 years. Monthly Payment payable by Purchaser is $3,990.55 per month for a period of 12 months with payments (*sic*)

beginning (*sic*) May 1st, 2018 and continuing on the same day of each month thereafter for the period of 11 months.  The unpaid balance of $536,344.67 becoming due and payable on April 1, 2019 as one final balloon payment.

**Strategy:**

Bring property to $18,500/month through conversion to tenant owned properties within 45 days.  Grow the equity to $695,000 for a high case out refinance in 11 months.

Seller finance, doesn't pay on the mortgage and forces the seller to foreclose on the property and forced the trust into bankruptcy

(the "Plum Circle Investment").

36.     According to Walsh, the Plum Circle Investment included the purchase of the Chipley Property for $805,000.00 with a down payment of $265,000.00 and seller financing of $540,000.00 with a 7.5% interest rate per annum amortized over 25 years.

37.     On or about February 20, 2018, Craven, through CRG, entered into the Land Trust Agreement for the Plum Circle Community Trust (the "PCC Trust") (attached hereto as **Exhibit C**) for the purpose of acquiring and rehabilitating the Chipley Property.

38.     On or about February 20, 2018, Plaintiffs invested $265,000.00 (the "Plum Circle Investment Funds") to be used solely as a down payment towards the purchase price of the Chipley Property. Plaintiffs were to be passive investors and acquire a 50% beneficial interest in the Chipley Property through the PCC Trust.

39.     Walsh designated himself as the Trustee of the PCC Trust, thereby creating a special relationship between himself and Plaintiffs. Walsh was entrusted with, among other responsibilities, acquiring, renovating and capitalizing the Chipley Property to the point of refinance, cash out and payback of the initial investment plus profit. The PCC Trust documents, prepared by Walsh, specifically reference that the Plum Circle Investment Funds was solely for the acquisition of the Chipley Property.

40.     Upon information and belief, neither Walsh nor any of his affiliated entities invested any capital into the PCC Trust with respect to the Chipley Property.

41.     As Trustee, Walsh was also required "to keep [] careful books showing the receipts and disbursements he[] has made on behalf of the Trust and also of the Trust Property and to keep books of the Trust open to the inspection of the beneficiaries." Walsh failed in this duty, as the record keeping was in disarray and Walsh was unable to accurately account to Plaintiffs for the receipts and disbursements of the PCC Trust.

42.     Meanwhile, despite Walsh's representations to Plaintiffs, Walsh convinced the seller of the Chipley Property to finance the mortgage for the remainder of the purchase price.

43.     Plaintiff's investment in the PCC Trust was based on Walsh's knowingly false representations, purported experience and expertise in buying and rehabilitating mobile home parks for investment and profit, and his alleged vetting of the Chipley property.

44.     Walsh's representations were knowingly false. For example:

   a.  Walsh did not invest all of the money into the down payments for the Chipley property, instead he misappropriated some or all of the invested funds for personal use or use on his affiliate entities.

   b.  Walsh knowingly overstated the value of the Chipley property.

   c.  Walsh inflated the purchase price of the Chipley property.

   d.  Walsh did not invest his own funds to improve the Chipley property as promised.

   e.  Walsh misappropriated rents from the Chipley property.

   f.  Walsh did not bring the Chipley property to "maximum capacity". Instead, without the requisite authority, Walsh sold the assets of the PCC Trust, including the mobile homes.

   g.  Walsh took a 10% management fee from the income of the Chipley property while claiming that the property was otherwise operating at a loss.

   h.  Walsh, through misuse or misappropriation of investment funds, intentionally allowed the Chipley property to fall into disrepair.

   i.  Walsh failed to execute his duties as trustee of the PCC Trust.

   j.  Walsh intentionally forced the Chipley property into foreclosure and the PCC Trust into bankruptcy without the requisite consent or approval of the PCC Trust beneficiaries.

   k.  Walsh entered into contracts for deed for the Chipley property that the PCC Trust without properly acquiring title by deed with a title policy.

45.     Walsh knowingly and intentionally misrepresented the value of the Chipley Property to induce Plaintiffs to make an investment of $265,000.00.

46.     Upon information and belief, Walsh misappropriated the Plum Circle Investment Funds for personal use, to pay off debts unrelated to the Chipley Property, and intentionally neglected to rehabilitate (or at a minimum maintain) and manage the Chipley Property. As a result, Plaintiffs have likely lost their entire $265,000.00 investment.

47.     Moreover, Walsh misrepresented the purchase price of the Chipley Property to Plaintiffs. Pursuant to the February 14 Email, Walsh represented to Plaintiffs that the purchase price for the Chipley Property was $805,000.00—this was false. At the time Walsh made this representation, Walsh knew the representation was false, as the purchase price for the Chipley Property was never $805,000.00. A true and correct copy of the closing statement for the Chipley Property is attached hereto as **Exhibit D**. Walsh never provided Plaintiffs with a copy of the closing statement.

48.     Walsh has testified under oath that at the time he sent the February 14 Email to Craven that the purchase price was not $805,000.00, it was actually $700,000.00. As reflected in the closing statement, Walsh or his affiliated entities pocketed approximately $100,000.00 from the closing of the Chipley Property—this was never disclosed to Plaintiffs.

49.     On May 31, 2020, Walsh caused the PCC Trust to file a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Middle District of Florida (Tampa Division).

50.     While Walsh signed the bankruptcy petition on behalf of the PCC Trust, Walsh did not have the requisite authority to commence the bankruptcy filing.

51.     After a three-day trial, on August 12, 2020, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee in the PCC Trust bankruptcy case, thereby removing Walsh as the manager/trustee of the PCC Trust. The Bankruptcy Court's findings, *i.e.*,

"that Mr. Walsh has been – you can call it 'incompetent,' you can call it 'fraud,' you can call it 'dishonesty,'" applied equally to the PCC Trust bankruptcy case and the PCC Trust bankruptcy case.

52.     Further, when the Bankruptcy Court appointed a chapter 11 trustee with respect to the Chipley Property, the Bankruptcy Court noted numerous misrepresentations by Walsh and specifically made the following finding: "Mr. Craven is another example of a misrepresentation. You told Mr. Craven that the purchase price was $800,000 for [the Chipley Property] and it wasn't and **you knew it wasn't.**" The Bankruptcy Court further found that Walsh never advised Plaintiffs that the purchase price for the Chipley Property was actually $700,000.00 before Plaintiffs parted with their money and made the investment.

53.     In participating in the Plum Circle Investment and delivering the Plum Circle Investment Funds to Walsh and Parks Management, Plaintiffs relied on Walsh's representations regarding the use of the funds and the purchase price of the Chipley Property. Had Walsh disclosed to Plaintiffs the true purchase price of the Chipley Property and that Walsh and his affiliates would improperly retain approximately $100,000.00 from the closing, then Plaintiffs would have never made the investment and parted with the Plum Circle Investment Funds.

54.     The PCC Trust bankruptcy case brought to light Walsh's mismanagement of the Chipley Property and uncovered the fraudulent scheme that Walsh utilized to obtain the Plum Circle Investment funds from Plaintiffs.

**Civil Theft Demand Letter**

55.     On June 12, 2020, Plaintiffs sent a demand letter to Walsh pursuant to Fla. Stat. § 772.11 (the "Demand Letter"). In the Demand Letter, Plaintiffs sought the return of the Gainesville Road Investment Funds and Plum Circle Investment Funds.

56.     Plaintiffs advised Walsh that (i) the Gainesville Road Investment Funds and Plum Circle Investment Funds were not used for the purpose in which the funds were provided to Walsh; (ii) Walsh intentionally obtained the Gainesville Road Investment Funds and Plum Circle Investment Funds by false pretenses, fraud, deception, willful misrepresentations, or false promises; (iii) Walsh knowingly converted the Gainesville Road Investment Funds and Plum Circle Investment Funds to his own personal use; and (iv) Walsh deprived Plaintiffs of the Gainesville Road Investment Funds and Plum Circle Investment Funds and any correlating benefit.[2]

57.     Walsh never returned the Gainesville Road Investment Funds or Plum Circle Investment Funds to Plaintiffs and has never accounted to Plaintiffs for such funds. In fact, as of the filing of this Complaint, Walsh has never even responded to the Demand Letter.

58.     Walsh has repeatedly referred to Craven as his "partner" with respect to the Gainesville Road Properties and the Chipley Property; however, Walsh certainly has not treated Craven as a "partner." Walsh took advantage of Craven by fraudulently inducing Plaintiffs to invest the Gainesville Road Investment Funds and Plum Circle Investment Funds with the false promise of the return of the investments, plus profit and interest, and then failing to account to Plaintiffs for his actions.

59.     Plaintiffs have retained the law firm of Lewis Brisbois Bisgaard & Smith LLP to provide legal services to represent their interests in this action and have agreed to pay the firm a reasonable fee for services rendered.

---

[2] Plaintiffs also noted in the Demand Letter that they were entitled to rescission of their investments under Florida and Federal securities laws.

60.     All conditions precedent to this action have been performed, occurred, satisfied, waived, or excused, or the performance of conditions precedent would be futile.

## COUNT I – FRAUD
### (as to the Gainesville Road Investment)

61.     Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

62.     This is an action against Defendants for fraud.

63.     As alleged herein, Walsh made statements to Plaintiffs concerning the material facts of, *inter alia*, how the Gainesville Road Investment Funds would be invested, the circumstances regarding the Gainesville Road Properties, how the Gainesville Road Investment Funds would be repaid, actions Plaintiffs would take with respect to rehabilitating the Gainesville Road Properties and investing their own funds, and his purported knowledge, experience, and expertise in buying and rehabilitating mobile home parks for investment and profit.

64.     Walsh made these statements to Plaintiffs although he knew these representations to be false.

65.     In an effort to perpetrate his scheme and obtain and steal Plaintiffs' Gainesville Road Investment Funds, Walsh convinced Craven to enter into a Land Trust Agreement with respect to the GRC Trust that would allegedly benefit Plaintiffs.

66.     Walsh then convinced Plaintiffs to entrust him as the sole trustee of the GRC Trust. Walsh knew that as the sole trustee he would have the opportunity to conceal his misuse of the Gainesville Road Investment Funds. As Trustee, Walsh, individually and through Parks Management, was able to ultimately utilize the Gainesville Road Investment Funds for his personal use and/or for the benefit of other affiliate entities and not for the purpose in which Plaintiffs provided the funds to Defendants.

67. In making the knowingly false representations, Walsh intended to, and did, induce Plaintiffs to deliver the Gainesville Road Investment Funds to Defendants and execute the GRC Trust documents.

68. Plaintiffs acted in reliance on Walsh's false representations and invested the Gainesville Road Investment Funds under the belief that said funds would be invested as Walsh promised and to which Plaintiffs agreed and Defendants would take such other actions as they represented that they would.

69. As a result of Plaintiffs' reliance upon Walsh's false representations, they suffered significant monetary damages, including the loss of $300,000.00 (the Gainesville Road Investment Funds), the lost equity in the Gainesville Road Properties of $1,120,00.00, income, and interest.

<u>**COUNT II – FRAUD**</u>
**(as to the Plum Circle Investment)**

70. Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

71. This is an action against Defendants for fraud.

72. As alleged herein, Walsh made statements to Plaintiffs concerning the material facts of, *inter alia*, how the Plum Circle Investment Funds would be invested, the circumstances regarding the Chipley Property, how the Plum Circle Investment Funds would be repaid, actions Plaintiffs would take with respect to rehabilitating the Chipley Property and investing their own funds, and his purported knowledge, experience, and expertise in buying and rehabilitating mobile home parks for investment and profit.

73. Walsh made these statements to Plaintiffs although he knew these representations to be false.

74.     In an effort to perpetrate his scheme and obtain and steal Plaintiffs' Plum Circle Investment Funds, Walsh convinced Plaintiffs to enter into a Land Trust Agreement with respect to the PCC Trust that would allegedly benefit Plaintiffs.

75.     Walsh then convinced Plaintiffs to entrust him as the sole trustee of the PCC Trust. Walsh knew that as the sole trustee he would have the opportunity to conceal his misuse of the Plum Circle Investment Funds. As Trustee, Walsh, individually and through Parks Management, was able to ultimately utilize the Plum Circle Investment Funds for his personal use and/or for the benefit of other affiliate entities and not for the purpose in which Plaintiffs provided the funds to Defendants.

76.     In making the knowingly false representations, Walsh intended to, and did, induce Plaintiffs to deliver the Plum Circle Investment Funds to Defendants and execute the PCC Trust documents.

77.     Plaintiffs acted in reliance on Walsh's false representations and invested the Plum Circle Investment Funds under the belief that said funds would be invested as Walsh promised and to which Plaintiffs agreed, and Defendants would take such other actions as they represented that they would.

78.     As a result of Plaintiffs' reliance upon Walsh's false representations, they suffered significant monetary damages, including the loss of $265,000.00 (the Plum Circle Investment Funds), the lost equity in the Chipley Property of $395,000.00, income, and interest.

### COUNT III – VIOLATION OF FLORIDA BLUE SKY LAWS
#### (as to the Gainesville Road Investment)

79.     Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

80.     This is an action against Defendants for violations of the Florida Securities and Investor Protection Act ("FISPA"), Fla. Stat. §§ 517.011, *et seq*.

81.     Pursuant to Fla. Stat. § 517.301(1)(a), it is unlawful and a violation of FSIPA for a person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of § 517.051 and including any security sold in a transaction exempted under the provisions of § 517.061, directly or indirectly:

    (a) to employ any device, scheme, or artifice to defraud;

    (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

82.     It is also unlawful to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. Fla. Stat. § 517.301(1)(c).

83.     Pursuant to Fla. Stat. § 517.211(2), any person purchasing or selling a security in violation of § 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

84.     A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of income received by the purchaser on the

security or investment, in addition to an award of prevailing party attorneys' fees. *See* Fla. Stat. § 517.211(3).

85.    Defendants employed a scheme to defraud Plaintiffs into making an investment in the GRC Trust and the Gainesville Road Properties—the Gainesville Road Investment.

86.    The acceptance of Plaintiffs' investment, *i.e.*, the Gainesville Road Investment Funds, in exchange for a beneficial interest in title to notes, evidence of indebtedness, property, profits, or earnings is a "Security" as defined within the meaning and intent of Fla. Stat. § 517.021(21).

87.    Pursuant to the terms offered by Walsh, individually and on behalf of his affiliate entities, Plaintiffs would "invest" funds with Walsh, for which Plaintiffs would receive a beneficial interest in real property plus a return on their investment from the income the property produced.

88.    Walsh, individually and through Parks Management, purported to engage in the essential managerial effort and activities which would drive the success of the investment. Plaintiffs were only to provide the Gainesville Road Investment Funds and share in the earnings and profits generated by the income producing properties that were to be invested in by Walsh, leaving the management, control, and operation to Defendants.

89.    Walsh, in violation of §§ 517.211 and 517.301, knowingly and willfully, during the sale of a security, obtained the Gainesville Road Investment Funds by means of untrue statements of a material fact. In addition, Walsh omitted material facts that were necessary under the circumstances to render said statements not misleading.

90.    Defendants engaged in transactions, practices, and a course of business that operated as a fraud on Plaintiffs.

91.     Defendants acted with scienter, knew that their representations were false, and intended that Plaintiffs rely upon the representations and omissions to induce them to invest their money with Defendants.

92.     As alleged herein, *inter alia*, Walsh: i) represented that he would invest the Gainesville Road Investment Funds in income producing real estate for the benefit of Plaintiffs, although he knew said representations to be false; ii) failed to advise Plaintiffs of the risks inherent in investing with him, including, but not limited to, the potential decline in the value of any real property purchased or fluctuations in income and expenses of the properties; iii) failed to advise Plaintiffs that the Gainesville Road Investment would not be liquid and that Plaintiffs could not obtain a return of principal upon demand; iv) failed to properly advise Plaintiffs of the growing risks of continued investment with Walsh and his affiliate entities, including Walsh's prior history with respect to investing in mobile home parks; v) failed to advise Plaintiffs of the true condition and value of the Gainesville Road Properties; and vi) failed to advise Plaintiffs that Defendants had no intention of putting their own funds into the Gainesville Road Investment.

93.     Plaintiffs relied upon Walsh's representations and omissions in making their investment in the Gainesville Road Investment, and have been damaged.

94.     In violation of Fla. Stat. § 517.07, Walsh offered to sell the subject security within Florida, which security was not registered pursuant to the provisions of § 517.011, *et seq*.

95.     Plaintiffs, in accordance with Fla. Stat. § 517.211(3), are entitled to recover the consideration paid for the security, *i.e.*, the Gainesville Road Investment Funds ($300,000.00), plus interest from the date of the investment, less any income received by Plaintiffs.

96. Additionally, based upon Defendants' fraudulent conduct and concealment of facts in connection with the sale of the security, Plaintiffs are entitled to recover from Defendants payment of their attorneys' fees and costs in accordance with Fla. Stat. § 517.211(6).

97. Plaintiffs tender their investments in the GRC Trust and the Gainesville Road Properties—the Gainesville Road Investment

## COUNT IV – VIOLATION OF FLORIDA BLUE SKY LAWS
### (as to the Plum Circle Investment)

98. Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

99. This is an action against Defendants for violations of the Florida Securities and Investor Protection Act ("FISPA"), Fla. Stat. §§ 517.011, *et seq*.

100. Pursuant to Fla. Stat. § 517.301(1)(a), it is unlawful and a violation of FSIPA for a person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of § 517.051 and including any security sold in a transaction exempted under the provisions of § 517.061, directly or indirectly:

  (a) to employ any device, scheme, or artifice to defraud;

  (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

  (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

101. It is also unlawful to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or

representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. Fla. Stat. § 517.301(1)(c).

102.    Pursuant to Fla. Stat. § 517.211(2), any person purchasing or selling a security in violation of § 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

103.    A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of income received by the purchaser on the security or investment, in addition to an award of prevailing party attorneys' fees. *See* Fla. Stat. § 517.211(3).

104.    Defendants employed a scheme to defraud Plaintiffs into making an investment in the PCC Trust and the Chipley Property—the Plum Circle Investment.

105.    The acceptance of Plaintiffs' investment, *i.e.*, the Plum Circle Investment Funds, in exchange for a beneficial interest in title to notes, evidence of indebtedness, property, profits, or earnings is a "Security" as defined within the meaning and intent of Fla. Stat. § 517.021(21).

106.    Pursuant to the terms offered by Walsh, individually and on behalf of his affiliate entities, Plaintiffs would "invest" funds with Walsh, for which Plaintiffs would receive a beneficial interest in real property plus a return on their investment from the income the property produced.

107.    Walsh, individually and through Parks Management, purported to engage in the essential managerial effort and activities which would drive the success of the investment. Plaintiffs were only to provide the Plum Circle Investment Funds and share in the earnings and

profits generated by the income producing properties that were to be invested in by Walsh, leaving the management, control, and operation to Defendants.

108.     Walsh, in violation of §§ 517.211 and 517.301, knowingly and willfully, during the sale of a security, obtained the Plum Circle Investment Funds by means of untrue statements of a material fact. In addition, Walsh omitted material facts that were necessary under the circumstances to render said statements not misleading.

109.     Defendants engaged in transactions, practices, and a course of business that operated as a fraud on Plaintiffs.

110.     Defendants acted with scienter, knew that their representations were false, and intended that Plaintiffs rely upon the representations and omissions to induce them to invest their money with Defendants.

111.     As alleged herein, *inter alia*, Walsh i) represented that he would invest the Plum Circle Investment Funds in income producing real estate for the benefit of Plaintiffs, although he knew said representations to be false; ii) failed to advise Plaintiffs of the risks inherent in investing with him, including, but not limited to, the potential decline in the value of any real property purchased or fluctuations in income and expenses of the properties; iii) failed to advise Plaintiffs that the Plum Circle Investment would not be liquid and that Plaintiffs could not obtain a return of principal upon demand; iv) failed to properly advise Plaintiffs of the growing risks of continued investment with Walsh and his affiliate entities, including Walsh's prior history with respect to investing in mobile home parks; v) failed to advise Plaintiffs of the true condition and value of the Chipley Property; and vi) failed to advise Plaintiffs that Defendants had no intention of putting their own funds into the Plum Circle Investment.

112.     Plaintiffs relied upon Walsh's representations and omissions in making their investment in the Plum Circle Investment, and have been damaged.

113.     In violation of Fla. Stat. § 517.07, Walsh offered to sell the subject security within Florida, which security was not registered pursuant to the provisions of § 517.011, *et seq*.

114.     Plaintiffs, in accordance with Fla. Stat. § 517.211(3), are entitled to recover the consideration paid for the security, *i.e.*, the Plum Circle Investment Funds ($265,000.00), plus interest from the date of the investment, less any income received by Plaintiffs.

115.     Additionally, based upon Defendants' fraudulent conduct and concealment of facts in connection with the sale of the security, Plaintiffs are entitled to recover from Defendants payment of their attorneys' fees and costs in accordance with Fla. Stat. § 517.211(6).

116.     Plaintiffs tender their investments in the PCC Trust and the Chipley Property—the Plum Circle Investment.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (as to the GRC Trust)

117.     Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

118.     This is a cause of action against Walsh for breach of fiduciary duty.

119.     Walsh managed and/or controlled the GRC Trust at all times relevant to this action and was the Trustee pursuant to the GRC Trust documents.

120.     Walsh knew or had reason to know Plaintiffs placed their trust and confidence in him and relied on his representations and obligations to ensure proper protocol, procedures, and due care were followed in all transactions and actions of the GRC Trust.

121.     Walsh established a fiduciary duty with Plaintiffs, whether express or implied in law, based upon the  special relationship and the specific factual circumstances described herein.

122.     Plaintiffs were justified in placing their trust and confidence in Walsh.

123.     Walsh owed duties to Plaintiffs of loyalty, prudent administration and control of the trust property, refraining from gross negligence or reckless conduct, self-dealing, and willful or intentional misconduct.

124.     Walsh was further required to discharge his duties consistently with the obligations of good faith and fair dealing.

125.     Walsh breached his fiduciary obligations to Plaintiffs, as described herein.

126.     Walsh's misconduct caused significant damage to Plaintiffs.

127.     Walsh's breaches amount to willful and intentional misconduct or, at the very least, gross negligence and reckless misconduct.

128.     Further, Walsh's misconduct caused the Gainesville Road Properties to fall into disrepair, lose income, have foreclosure proceedings commenced against them, and ultimately be forced into bankruptcy proceedings.

129.     Plaintiffs have been damaged as a direct and proximate result of Walsh's breaches of fiduciary duty.

## <u>COUNT VI – CONSTRUCTIVE FRAUD</u>
### (as to the Gainesville Road Investment)

130.     Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

131.     This is a cause of action against Defendants for constructive fraud relating to the Gainesville Road Investment.

132.     A duty to Plaintiffs under a confidential or fiduciary relationship has been abused.

133.     An unconscionable or improper advantage has been taken of Plaintiffs.

134.    As specifically described herein, a fraudulent scheme was perpetrated upon Plaintiffs, based upon knowingly false statements concerning material facts and concealment.

135.    Plaintiffs relied upon the knowingly false statements concerning material facts and concealment, were induced to provide their investments, and have been damaged.

136.    The fraudulent scheme perpetrated upon Plaintiffs was wrongful, and equitable interference is justified under these circumstances.

## COUNT VII – BREACH OF FIDUCIARY DUTY
### (as to the PCC Trust)

137.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

138.    This is a cause of action against Walsh for breach of fiduciary duty.

139.    Walsh managed and/or controlled the PCC Trust at all times relevant to this action and was the Trustee pursuant to the PCC Trust documents.

140.    Walsh knew or had reason to know Plaintiffs placed their trust and confidence in him and relied on his representations and obligations to ensure proper protocol, procedures, and due care were followed in all transactions and actions of the PCC Trust.

141.    Walsh established a fiduciary duty with Plaintiffs, whether express or implied in law, based upon the  special relationship and the specific factual circumstances described herein.

142.    Plaintiffs were justified in placing their trust and confidence in Walsh.

143.    Walsh owed duties to Plaintiffs of loyalty, prudent administration and control of the trust property, refraining from gross negligence or reckless conduct, self-dealing, and willful or intentional misconduct.

144.    Walsh was further required to discharge his duties consistently with the obligations of good faith and fair dealing.

145.    Walsh breached his fiduciary obligations to Plaintiffs, as described herein.

146.    Walsh's misconduct caused significant damage to Plaintiffs.

147.    Walsh's breaches amount to willful and intentional misconduct or, at the very least, gross negligence and reckless misconduct.

148.    Further, Walsh's misconduct caused the Chipley Property to fall into disrepair, lose income, have foreclosure proceedings commenced against it, and ultimately be forced into bankruptcy proceedings.

149.    Plaintiffs have been damaged as a direct and proximate result of Walsh's breaches of fiduciary duty.

## VIII – CONSTRUCTIVE FRAUD
### (as to the Plum Circle Investment)

150.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

151.    This is a cause of action against Defendants for constructive fraud relating to the Gainesville Road Investment.

152.    A duty to Plaintiffs under a confidential or fiduciary relationship has been abused.

153.    An unconscionable or improper advantage has been taken of Plaintiffs.

154.    As specifically described herein, a fraudulent scheme was perpetrated upon Plaintiffs, based upon knowingly false statements concerning material facts and concealment.

155.    Plaintiffs relied upon the knowingly false statements concerning material facts and concealment, were induced to provide their investments, and have been damaged.

156.    The fraudulent scheme perpetrated upon Plaintiffs was wrongful, and equitable interference is justified under these circumstances.

**COUNT IX – UNJUST ENRICHMENT**
**(as to the Gainesville Road Investment)**

157.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

158.    This is a cause of action against Defendants for unjust enrichment.

159.    By delivering the Gainesville Road Investment Funds to Defendants, Plaintiffs conferred a benefit on Defendants, each of whom has knowledge of the benefit conferred.

160.    Defendants voluntarily accepted and retained the benefits conferred by Plaintiffs.

161.    Because Plaintiffs provided substantial benefits to Defendants and Defendants provided no corresponding benefit to Plaintiffs because, *inter alia*, Defendants did not invest all of the Gainesville Road Investment Funds into the down payment or rehabilitation of the Gainesville Road Properties as required and instead kept some or all of the funds for Defendants or their affiliates; Defendants failed to improve the Gainesville Road Properties , instead allowing the properties to fall into disrepair; Defendants mismanaged the Gainesville Road Properties and misappropriated rents; Defendants improperly took a 10% management fee from the income of the property while claiming that the Gainesville Road Properties were otherwise operating at a loss; and Defendants allowed the Gainesville Road Properties to go into foreclosure and Defendants ultimately forced the GRC Trust into bankruptcy, the circumstances render the Defendants' retention of the benefits conferred inequitable unless Defendants return the monies to Plaintiffs.

**COUNT X – UNJUST ENRICHMENT**
**(as to the Plum Circle Investment)**

162.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

163.    This is a cause of action against Defendants for unjust enrichment.

164.    By delivering the Plum Circle Investment Funds to Defendants, Plaintiffs conferred a benefit on Defendants, each of whom has knowledge of the benefit conferred.

165.    Defendants voluntarily accepted and retained the benefits conferred by Plaintiffs.

166.    Because Plaintiffs provided substantial benefits to Defendants and Defendants provided no corresponding benefit to Plaintiffs because, *inter alia*, Defendants did not invest all of the Plum Circle Investment Funds into the down payment for the Chipley Property as required and instead kept some or all of the funds for Defendants or their affiliates; Defendants failed to improve the Chipley Property, instead allowing the property to fall into disrepair; Defendants mismanaged the Chipley Property and misappropriated rents; Defendants improperly took a 10% management fee from the income of the property while claiming that the Chipley Property was otherwise operating at a loss; and Defendants allowed the Chipley Property to go into foreclosure and Defendants ultimately forced the PCC Trust into bankruptcy, the circumstances render the Defendants' retention of the benefits conferred inequitable unless Defendants return the monies to Plaintiffs.

## COUNT XI – CONVERSION
### (as to the Gainesville Road Investment)

167.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

168.    This is a cause of action against Defendants for conversion.

169.    Defendants improper taking and retention of the Gainesville Road Investment Funds which belong to Plaintiffs gives rise to a claim for conversion. Defendants, without authorization, asserted dominion and control over the Gainesville Road Investment Funds.

170.    The Gainesville Road Investment Funds are specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.

171.    Defendants' conversion is inconsistent with Plaintiffs' rights and ownership of the Gainesville Road Investment Funds.

172.    Walsh solicited and advised Plaintiffs to invest in the Gainesville Road Investment. Upon trust and advice and based upon Walsh's solicitation and misrepresentations, Plaintiffs invested $300,000.00 (the Gainesville Road Investment Funds) into the GRC Trust for purposes of providing a down payment towards acquiring the Gainesville Road Properties. In return, Walsh promised income generation, profits, and refinancing that would result in a repayment of the initial investment after the properties were rehabilitated and exercising maximum use.

173.    Instead of using the Gainesville Road Investment Funds as solicited, promised, advised, and agreed upon, Walsh converted the Gainesville Road Investment Funds for his own benefit and use or that of his affiliated entities.

174.    The Gainesville Road Investment Funds were wrongfully and illegitimately used for the benefit of Defendants.

175.    Plaintiffs made a demand for the return of the Gainesville Road Investment Funds, but the funds have not been returned. Defendants have been confronted with the fact that they stole and converted Plaintiffs' property, but Defendants have failed to return any of the property to Plaintiffs and have ignored Plaintiffs' demands.

176.    As a direct and proximate result of Defendants' conversion of the Gainesville Road Investment Funds, Plaintiffs have been damaged.

### <u>COUNT XII – CONVERSION</u>
### (as to the Plum Circle Investment)

177.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

178.    This is a cause of action against Defendants for conversion.

179.    Defendants improper taking and retention of the Plum Circle Investment Funds which belong to Plaintiffs gives rise to a claim for conversion. Defendants, without authorization, asserted dominion and control over the Plum Circle Investment Funds.

180.    The Plum Circle Investment Funds are specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.

181.    Defendants' conversion is inconsistent with Plaintiffs' rights and ownership of the Plum Circle Investment Funds.

182.    Walsh solicited and advised Plaintiffs to invest in the Plum Circle Investment. Upon trust and advice and based upon Walsh's solicitation and misrepresentations, Plaintiffs invested $265,000.00 (the Plum Circle Investment Funds) into the PCC Trust for purposes of providing a down payment towards acquiring the Chipley Property. In return, Walsh promised income generation, profits, and refinancing that would result in a repayment of the initial investment after the properties were rehabilitated and exercising maximum use.

183.    Instead of using the Plum Circle Investment Funds as solicited, promised, advised, and agreed upon, Walsh converted the Plum Circle Investment Funds for his own benefit and use or that of his affiliated entities.

184.    The Plum Circle Investment Funds were wrongfully and illegitimately used for the benefit of Defendants.

185.    Plaintiffs made a demand for the return of the Plum Circle Investment Funds, but the funds have not been returned. Defendants have been confronted with the fact that they stole and converted Plaintiffs' property, but Defendants have failed to return any of the property to Plaintiffs and have ignored Plaintiffs' demands.

186.    As a direct and proximate result of Defendants' conversion of the Plum Circle Investment Funds, Plaintiffs have been damaged.

## COUNT XIII – CIVIL THEFT
### (as to the Gainesville Road Investment)

187.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

188.    This is a cause of action against Walsh for civil theft pursuant to Fla. Stat. § 772.11.

189.    Walsh unlawfully and knowingly obtained the Gainesville Road Investment Funds from Plaintiffs with the intent to temporarily or permanently deprive Plaintiffs of the right to that money and the benefit from that money and to appropriate that money to his own use, through the fraudulent means described herein.

190.    The acts of Walsh constitute violations of Fla. Stat. § 812.014, in that Walsh has stolen the principal sum of $300,000.00 from Plaintiffs through the fraudulent means described herein.

191.    Before filing this claim for civil theft, on June 12, 2020, Plaintiffs—through the Demand Letter—made written demand, by e-mail, U.S. First Class Mail, and Certified Mail Return Receipt Requested, on Walsh pursuant to Fla. Stat. § 772.11.

192.    To date, despite demand by Plaintiffs and Walsh's receipt of the Demand Letter, Walsh has failed to return the Gainesville Road Investment Funds to Plaintiffs and has never accounted to Plaintiffs for such funds. In fact, as of the filing of this Complaint, Walsh has never even responded to the Demand Letter. More than 30 days has passed since Walsh received the Demand Letter.

193.    As a direct and proximate cause of Walsh's unlawful actions, Plaintiffs were and continue to be deprived of their right to their property and the benefit therefrom.

194.    Plaintiffs have suffered damages in the minimum amount of $300,000.00, and, pursuant to Fla. Stat. § 772.11, Plaintiffs are entitled to treble damages in the minimum amount of $900,000.00.

### COUNT XIV – CIVIL THEFT
**(as to the Plum Circle Investment)**

195.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

196.    This is a cause of action against Walsh for civil theft pursuant to Fla. Stat. § 772.11.

197.    Walsh unlawfully and knowingly obtained the Plum Circle Investment Funds from Plaintiffs with the intent to temporarily or permanently deprive Plaintiffs of the right to that money and the benefit from that money and to appropriate that money to his own use, through the fraudulent means described herein.

198.    The acts of Walsh constitute violations of Fla. Stat. § 812.014, in that Walsh has stolen the principal sum of $265,000.00 from Plaintiffs through the fraudulent means described herein.

199.    Before filing this claim for civil theft, on June 12, 2020, Plaintiffs—through the Demand Letter—made written demand, by e-mail, U.S. First Class Mail, and Certified Mail Return Receipt Requested, on Walsh pursuant to Fla. Stat. § 772.11.

200.    To date, despite demand by Plaintiffs and Walsh's receipt of the Demand Letter, Walsh has failed to return the Plum Circle Investment Funds to Plaintiffs and has never accounted to Plaintiffs for such funds. In fact, as of the filing of this Complaint, Walsh has never even responded to the Demand Letter. More than 30 days has passed since Walsh received the Demand Letter.

201.    As a direct and proximate cause of Walsh's unlawful actions, Plaintiffs were and continue to be deprived of their right to their property and the benefit therefrom.

202.    Plaintiffs have suffered damages in the minimum amount of $265,000.00, and, pursuant to Fla. Stat. § 772.11, Plaintiffs are entitled to treble damages in the minimum amount of $795,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

a)  compensatory damages in an amount to be determined at trial;

b)  treble damages pursuant to Fla. Stat. § 772.11;

c)  interest pursuant to Fla. Stat. § 517.211(3);

d)  a full and complete accounting of any funds traceable to Plaintiffs, including the Gainesville Road Investment Funds and Plum Circle Investment Funds;

e)  rescission of Plaintiffs' investments;

f)  punitive damages;

g)  pre- and post-judgment interest and any other interest available under any applicable rule or statute;

h)  all costs of this action, including reasonable attorneys' fees and costs; and

i)  such other and further relief as this Court shall deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: December 22, 2020             Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
*Attorneys for Plaintiffs Joshua J. Craven and CRG Properties, Inc.*
110 SE 6th Street, Suite 2600
Fort Lauderdale, Florida 33301
Tel.: 954-728-1280
Fax: 954-728-1282
Vincent.Alexander@lewisbrisbois.com
Ishmael.Green@lewisbrisbois.com

By: /s/ Vincent F. Alexander
       Vincent F. Alexander
       Fla. Bar No. 68114
       Ishmael A. Green
       Fla. Bar No. 109100